IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

Rembrandt Data          )
Technologies, LP,       )
          Plaintiff,    )
                        )
     v.                 )    Case No. 1:08cv1009 (GBL)
                        )
AOL, LLC, et al.,       )
          Defendants.   )

## MEMORANDUM ORDER

THIS MATTER is before the Court on Defendants Canon U.S.A., Inc., Canon Business Solutions, Inc. and Canon Information Technology Services, Inc.'s Motion for Summary Judgment and Defendant DIRECTV's Motion for Summary Judgment. This case concerns Plaintiff Rembrandt Data Technologies, LP's allegations that the defendants produce and sell products that contain infringing dial-up modems, as well as the licenses Plaintiff and Defendants' predecessors in interest were parties to pertaining to this technology, and the validity and/or application of these licenses. There are 5 issues before the Court. The first issue is whether a comparison between the patents-in-suit and the V.34 standards instead of the actual accused products entitles Canon to summary judgment because such a comparison is insufficient for Rembrandt to carry its burden at trial. The second issue is whether an error in claim 3 of the '236 patent constitutes a typographical error that may be corrected by the Court, and if

not, whether the patent is fatally flawed for mixing apparatus and method claims.  The third issue is, whether subsequent to the divestiture of Rockwell, the license granted in the AT&T-Rockwell agreement belonged to Boeing or New Rockwell, and if it belonged to New Rockwell, whether the modems at issue qualify as "Licensed Products" so as to entitle Canon and DIRECTV to summary judgment under the doctrine of patent exhaustion with respect to the accused modems containing Conexant modems.  The fourth issue is whether the set-top boxes used by DIRECTV or the raw modems contained within those set-top boxes constitute the accused devices at issue, and if the set-top boxes are in fact the accused devices, whether the existence of middleware in the set-top boxes precludes a finding of infringement in light of the manner in which the middleware limits the function of the set-top box.  The final issue is whether the DIRECTV set-top boxes that contain Silicon Labs modems are authorized to employ the invention encompassed in the '236 and '578 patents by the 1999 PCTel-Paradyne License Agreement.

The Court makes the following findings.  First, the Court finds that Canon is not entitled to summary judgment based on the comparison between the patents-in-suit and the V.34 standard generally instead of the accused products specifically, because Rembrandt could have conceivably carried its burden at trial based on circumstantial evidence.  Second, the Court holds that

the error in claim 3 amounts to more than a mere typographical error, thus precluding editing by the Court, therefore requiring the invalidation of the '236 patent for improperly mixing method and apparatus claims.   Third, the Court finds that Canon and DIRECTV are entitled to summary judgment with respect to the accused devices that contain Conexant modems because following the distribution of Old Rockwell, the license was obtained by New Rockwell pursuant to the Plan of Distribution as an asset of the Semiconductor Systems Business, and Conexant was properly sublicensed under the agreement.   Fourth, the Court finds that the set-top boxes are the accused devices, not the raw modems, based on an assessment of various statements and submissions made by Rembrandt and that, because the middleware precludes the device from operating in an infringing manner DIRECTV is entitled to summary judgment.   Fifth, the Court finds that the PCTel-Paradyne License Agreement covers the accused DIRECTV devices that contain Silicon Labs modems because the patents-in-suit constitute Licensed Paradyne Products under §§ 1.3(b) and 1.5 of the Agreement, and § 2.2 protects downstream customers, third parties involved in a written development agreement with PCTel and said third parties' downstream customers, and the allegedly infringing code has been identified as PCTel code that was in some part the product of joint development between PCTel and Silicon Labs.

3

## I. BACKGROUND

This matter involves allegations of the infringement of two patents presently owned by Rembrandt – U.S. Patent Numbers 5,311,578 (hereinafter the '578 patent) and 5,251,236 (hereinafter the '236 patent) issued in 1993 and 1994 respectively and originally assigned to AT&T.  These patents relate to dial modems.  "A dial 'modem' is a device used to convert digital data into a signal that can be transmitted over telephone lines, and, when such a signal is received to convert it back into digital form." (Def.'s Claim Construction Br., 1.) The '578 patent, titled:  "Technique for Automatic Identification of a Remote Modem," claims the use of identification signals of a specified duration or of a "hidden" nature, to assist an originating modem to identify and connect to a remote modem during a standard call establishment procedure.  *See* '578 patent, col. 2:49-52.  The '236 patent, titled:  "Fractional Rate Modem with Trellis" describes a modem that combines a technique for more rapidly transferring data, called "fractional rate encoding" with another technique for reducing errors in data transmission, called "trellis encoding."  *See* '236 patent, col. 2:41-44.  In the First Amended Complaint, Rembrandt alleges that:

> 13.  The patents asserted in this Complaint cover certain aspects of, at least, the following International Telecommunications Union (ITU) modulation protocols for "Data Communication Over the Telephone Network" (ITU-T V.xx): V.8, V .34, V.90, and V.92.

4

14. All modems programmed to operate at 28.8
kbps or higher over the PSTN incorporate the
V.34 protocol.    All fax modems communicating
over the PSTN use the V.34 protocol use the
V.34 protocol.    All fax modems communicating
over the PSTN use the V.34 protocol.
15.    All fax-only modems that use the V.34
protocol are covered by the patents identified
in Counts II and III below.    Any dial modem,
other than a fax-only modem, that incorporates
the V.8/V.34/V.90 protocols require the modem
to have the structure covered by the product
claims of the patents in suit, and to use the
methods covered by method claims in suit.

(Am. Compl. ¶¶ 13-15.)

Rembrandt acquired the patents-in-suit in 2006 from Zhone,

who purchased them from Paradyne, a former subsidiary of

AT&T/Lucent, who had purchased them originally from AT&T.   This

opinion addresses claims related to only two of the defendants

involved in this litigation.   According to the First Amended

Complaint the Canon Defendants (hereinafter referred to

collectively as "Canon") are "one of the world's leading

manufacturers of plain paper copying machines and digital

multifunction devices."   (Am. Compl. ¶ 26.)   Rembrandt has

alleged that all unlicensed Canon products that contain a dial

modem and operate at certain specifications unlawfully infringe

the patents asserted in the Complaint.   Canon has sought summary

judgment on the following four grounds: 1) that the Conexant

modems contained in the accused Canon devices are licensed; 2)

Rembrandt has adduced insufficient evidence to support its

allegations at trial; 3) an error in the '236 patent cannot be

corrected by the Court and therefore the entire patent is invalid; and 4) that the '236 patent is invalid for indefiniteness based on a failure to disclose the structures that correspond to various functions set forth in the claims.

DIRECTV provides direct-to-home digital television services and multichannel video programming. According to the Amended Complaint certain of DIRECTV's receiving equipment contain dial modems that implement aspects of the V.8, V.34 and V.90 protocols, and as such unlawfully infringe the patents-in-suit. DIRECTV advances the following rationales in support of its motion for summary judgment: 1) that the set-top boxes (STBs) are the accused products and that the middleware contained therein preventing operation at the V.34 standard precludes a finding of infringement; and 2) that the modems[1] contained in the STBs are licensed.

The instant litigation commenced on September 26, 2008, with the filing of the Complaint alleging patent infringement by ten defendants who allegedly used infringing modems in a variety of products and services employing modems. On December 23, 2008, Rembrandt filed its First Amended Complaint alleging four counts of patent infringement. On April 30, 2009, the parties stipulated

---

[1]Defendant DIRECTV seeks summary judgment with respect to modems produced by both Conexant and Silicon Labs.

to the dismissal of Counts I and IV of the First Amended
Complaint.   Defendant Hewlett-Packard filed its motion for
summary judgment in advance of the June 9, 2009 hearing.   The
motion was denied on April 10, 2009.   At the close of discovery,
the Canon Defendants, DIRECTV and Rembrandt all filed motions for
summary judgment.   On June 9, 2009, the Court held a hearing
addressing *Markman* and *Daubert* issues, as well as the post-
discovery motions for summary judgment.   The Canon Defendants,
DIRECTV, Hewlett-Packard and Rembrandt participated in this
hearing.

## II. DISCUSSION

### A. Standard of Review

Under Federal Rule of Civil Procedure 56, the Court must
grant summary judgment if the moving party demonstrates that
there is no genuine issue as to any material fact, and that the
moving party is entitled to judgment as a matter of law.   FED. R.
CIV. P. 56(c).   In reviewing a motion for summary judgment, the
Court views the facts in a light most favorable to the non-moving
party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255
(1986).   Once a motion for summary judgment is properly made and
supported, the opposing party has the burden of showing that a
genuine dispute exists.   *Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S. 574, 586-87 (1986).   "[T]he mere existence
of some alleged factual dispute between the parties will not

7

defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

**B. Analysis**

*i. Comparison of accused devices to V.34 Standard*

The Court denies Canon's Motion for Summary Judgment with respect to Rembrandt's comparison of the accused devices to the V.34 standard as insufficient proof of infringement, because infringement may be proven with either direct or circumstantial evidence. "A patentee may prove direct infringement . . . by either direct or circumstantial evidence. There is no requirement that direct evidence be introduced, nor is a jury's

8

preference for circumstantial evidence over direct evidence unreasonable *per se*." *Liquid Dynamics Corp. v. Vaughan Co. Inc.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006). *See also, Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1060 (Fed. Cir. 2009) ("To prove infringement, a patentee must show 'that a defendant has practiced each and every element of the claimed invention,' and may do so by relying on either direct or circumstantial evidence."). "In order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." *Lucent Techs. v. Gateway, Inc.*, 543 F.3d 710, 723 (Fed. Cir. 2008) (internal quotations omitted).

Here, Canon has argued that is it entitled to summary judgment because the evidence that Rembrandt has produced to support a finding of infringement is insufficient to succeed at trial. Canon contests the sufficiency of Rembrandt's comparison of the accused devices to the V.34 standard as proof of infringement (as opposed to a direct comparison to the accused devices), declaring that Rembrandt has failed to show that the accused products: 1) practice all of the limitations in the patent claims; 2) employ structures identical to those corresponding to the functions recited by the claims; and 3) employ the structures in a manner identical to that disclosed in the specification. (Canon Mem. Supp. Mot. Summ. J. 16.)

9

Specifically, Canon challenges the sufficiency of Rembrandt's claim chart, expert infringement analysis, and test result summary for this exact reason, and ask the Court to grant summary judgment in Canon's favor based on a finding that this evidence in insufficient to carry Rembrandt's burden at trial.

As previously stated however, Rembrandt may prove infringement through direct or circumstantial evidence. Without passing judgment as to whether the evidence presented by Rembrandt would be enough to ultimately carry the day with a jury, the Court does find it to be sufficient to survive summary judgment as it is conceivable that a jury would find this admittedly circumstantial evidence sufficient and persuasive. Therefore, the Court denies Canon's Motion for Summary Judgment on the grounds that Rembrandt has produced insufficient evidence to carry its burden at trial, because patentees are permitted to prove infringement through the use of direct or circumstantial evidence such as that presented by Rembrandt.[2]

---

[2]Canon has also raised the issue of whether the V.34 standard reads on the '578 patent. This opinion does not address that issue because its resolution is not necessary to the ultimate disposition in this matter.

*ii. Claim 3 of the '236 patent*

The Court grants Canon's Motion for Summary Judgment with respect to the '236 patent on the grounds that it is fatally flawed for mixing a method and apparatus claim which it would be inappropriate for the district court to edit because the error amounts to more than a clear typographical error. Pursuant to 35 U.S.C. § 112 ¶ 2, a patent specification, "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. "[R]eciting both an apparatus and a method of using that apparatus renders a claim indefinite under section 112, paragraph 2." *IPXI Holdings, L.L.C. v. Amazon.com*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). The rationale for this is that such a claim is insufficiently precise "to provide competitors with an accurate determination of the metes and bounds of protection involved and is ambiguous and properly rejected under section 112, paragraph 2." *Id.* The editing of patent claims is generally disfavored, and the Federal Circuit has announced that, "[t]his court . . . repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). *See also, Pfizer, Inc. v. Ranbazy Lab. Ltd.*, 457 F.3d 1284, 1292 (Fed. Cir. 2006) ("[W]e should not rewrite claims

11

to preserve validity.")  "Courts must construe the claim as written, not as the patentees wish they had written it." *Chef. Am.*, 358 F.3d at 1374.  Courts in patent infringements suits may however correct obvious clerical errors. *I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 442 (1926); *Lucent Tech., Inc.*, 525 F.3d at 1216 n.8.  "A district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification; and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).

The parties are in agreement[3] that claim 3 of the '236 patent contains an error, and the real dispute centers around the propriety of the district court intervening to correct this acknowledged error.  Claim 3 of the '236 patent reads:

> 3. A data transmitting device for transmitting signals corresponding to an incoming stream of bits, comprising:

---

[3]In its Opening Claim Construction Brief, Rembrandt acknowledges the following:

> There can be no reasonable debate that there is an error in Claim 3, because Claim 3 is an apparatus claim that includes a method step. That is forbidden by patent law, and, thus, the method step was an error.  Indeed it is because the error is so plain and known by anyone in the field that there can be no question that the claim as written includes an obvious error.

(Rembrandt Opening Claim Construction Br. 27.)

first buffer means for partitioning said
stream into frames of unequal number of bits
and for separating the bits of each frame into
a first group and a second group of bits;
fractional encoding means for receiving
the first group of  bits of each frame and
performing fractional encoding to generate a
group of fractionally encoded bits;
second buffer means for combining said
second group of bits with said group of
fractionally encoded bits to form frames of
equal number of bits;
trellis  encoding  means  for  trellis
encoding the frames from said second buffer
means; and
transmitting the trellis encoded frames.

'236 patent col. 6:1-25.  Rembrandt proposes that this claim be

edited to change "transmitting the trellis encoded frames" to "a

transmitter section for transmitting the trellis encoded frames."

 Rembrandt argues that "because the error is so plain and known

by anyone in the field . . . there can be no question that the

claim as written includes an obvious error." (Rembrandt Opening

Claim Construction Br. 27.)  Rembrandt believes that the

correction is not subject to reasonable debate and the claim may

therefore be modified based on the language of claims 7 and 8

that depend on claim 3 which read:

7. The transmitter of claim 3 wherein said
transmitter   section   includes   quadrature
amplitude modulation encoding means.
8. The transmitter of claim 6 wherein said
transmitter   section   includes   quadrature
amplitude modulation encoding means.

'236 patent col. 6:41-46.  According to Rembrandt this change is

obvious and a mere typographical error "because Claims 7 and 8

13

depend from Claim 3, Claims 7 and 8 mandate that the 'transmitter section' must be part of Claim 3." (Opp'n Canon Mot. Summ. J. 30.) Canon however maintains that "Claim 3 and its dependent claims 6-11 are indefinite for improperly reciting both an apparatus (a "data transmitting device for transmitting signals") and a method of using that apparatus ("transmitting the trellis encoded frames"). (Defs.' Opening Claim Construction Br. 25.) Furthermore, Canon argues that "Rembrandt's proposed addition to the claim would significantly alter the meaning of one element, changing it from a method step to an apparatus step. This is beyond the ordinary types of corrections allowed by courts." (Canon Mem. Supp. Mot. Summ. J. 27.) Finally, Canon asserts that

> Rembrandt seems to imply that the proper claim language existed during prosecution of the application maturing into the '236, but that this correct language somehow did not make it into the issued patent. . . . [T]here is no evidence to support Rembrandt's assertion that a 'typographical' error occurred. The application claim that became patent claim 3 issued in the *identical form* as the applicants submitted it to the Patent Office. Claim 3, therefore, was invalid from [the] day the application was filed . . . .

(Canon Reply Mot. Summ. J. 14.)

Rembrandt's argument seems to be that the error that it seeks to have corrected is so obvious that everyone reviewing claim 3, both at the time of its initial prosecution and in the intervening fifteen years since, automatically read in the correct language because it was the only possible interpretation

14

of the claim, and as such it merits correction by the district
court.   Courts have been extremely discerning in limiting the
instances where they are willing to insert themselves to edit
errors in patent language.   *See Hoffer v. Microsoft Corp.*, 405
F.3d 1326, 1331 (Fed. Cir. 2005) (overturning the district
court's decision not to edit what the Federal Circuit deemed an
"obvious administrative error.").   Rembrandt cites to *Hoffer v.
Microsoft Corp.* in support of its position, a case where the due
to several revisions of the patent there were some errors in
renumbering that survived into the final version.   405 F.3d 1326
(Fed. Cir. 2005).   However, Rembrandt has failed to demonstrate
that the language at issue is anything other than what it
submitted to the Patent and Trademark Office.   Edits by district
courts are generally made in instances where the change is
extremely minor and/or obvious.   This is neither.   The impact of
the change proposed by Rembrandt would have a colossal effect,
and is far from minor or obvious.   The Court therefore grants
Canon's Motion for Summary Judgment with respect to the '236
claim based on the invalidity of the claims[4] stemming from the
mixture of apparatus and method claims because it would be
improper for the Court to undertake the revision proposed by

---

[4]At oral argument on June 9, 2009, counsel for Rembrandt
conceded that claims 3-11 necessarily fail if the Court declines
to edit claim 3.   Mot. Summ. J. Hr'g Tr. 58, June 9, 2009.

Rembrandt as it is not minor, obvious, free from reasonable
debate or evident from the prosecution history[5].

*iii. DIRECTV Set-top Boxes*

The Court grants DIRECTV's Motion for Summary Judgment on
the grounds that the set-top boxes are the accused devices and
they are incapable of infringing owing to the presence of the
middleware because Rembrandt has on multiple occasions identified
the STBs as the accused devices and because the presence of the
middleware prevents the devices from operating using an
infringing standard.

> Determining whether a patent claim has been
> infringed involves two steps: (1) claim
> construction to determine the scope of the
> claims, followed by (2) determination whether
> the properly construed claim encompasses the
> accused structure.   The first step, claim
> construction, is a matter of law . . . .   The
> second step, determination of infringement,
> whether literal or under the doctrine of
> equivalents, is a question of fact.   Thus, a
> literal infringement issue is properly decided
> upon summary judgment when no genuine issue of
> material fact exists, in particular, when no
> reasonable   jury   could   find   that   every

---

[5]In its Motion for Summary Judgment Canon also argued that
the claims in the '236 patent were indefinite under section 112
for failing to disclose the algorithms that corresponded to the
function set forth in the claims.  The Court finds that this
issue is moot in this of its ruling with respect to editing claim
3 of the '236 patent.

> limitation recited in the properly construed
> claim either is or is not found in the accused
> device.

*Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)
(internal citations omitted). With respect to the claims against
DIRECTV the issue is two-fold: first, whether the accused
devices are the STBs or the modems contained therein, and
secondly, if the STBs are the accused devices, whether the
middleware that limits the modems contained therein to operating
at the V.22 standard, and thereby inhibiting operation at the
V.34 standard, precludes a finding of infringement.

The Court begins by identifying the accused device. Prior
filings in this matter seeking court intervention to establish
the necessary level of specificity in naming and accusing devices
in the Amended Complaint demonstrate the parties' awareness of
the importance of specificity and precise language. Rembrandt's
position is that "DIRECTV's arguments of 'non-infringement' are
unavailing because they improperly focus not on the functionality
of the devices covered by, and accused of infringing, the
apparatus claims of the patents in suit (i.e. the dial modems
contained in the STBs) but on the functionality of the STB
itself." (Rembrandt Opp'n DIRECTV Mot. Summ. J. 23.)   DIRECTV
counters that its STBs are the accused devices, not the modems
contained therein. In an effort to resolve this dispute, the
Court starts with an examination of Rembrandt's representations

17

regarding the accused devices with respect to DIRECTV in this litigation.    The Court is drawn to three distinct pronouncements by Rembrandt identifying the accused products related to DIRECTV.

First the Court turns to Rembrandt's identification of the accused products in the First Amended Complaint.

> 23.    The dial modems in DIRECTV's receiving equipment call out from customer premises to dial modems at facilities used by DIRECTV to communicate with, and provide services to, DIRECTV customers over the PSTN.    At least some of these dial modems implement the aspects of the V.8, V.34, and V.90 modulation protocols covered by the asserted patents.    All unlicensed DIRECTV *products and equipment containing such dial modems unlawfully infringe* the patents asserted in this Complaint.

(Am. Compl. ¶ 23) (emphasis added).    Rembrandt has indicated here that it is the equipment that contains the modems that infringe as opposed to the modems themselves.

Second, the Court notes multiple averments made by Rembrandt several months after filing its First Amended Complaint where not only does Rembrandt reference the modems *in DIRECTV's accused products*, implying that the modems themselves are not in fact the accused device, but also repeatedly states that the modems are not merely chips but that the Court must also consider the related structures and software. (Rembrandt Opp'n DIRECTV Mot. Sanctions Mar. 4, 2009) (stating that "the modem chip numbers . . . do *not* identify the modems in DIRECTV's accused products" and

18

"the only information provided by DIRECTV in identifying the modems in the accused products . . . .").

Finally, the Court notes that in Exhibit 3 of the report of Rembrandt's expert, Dr. Goldstein, who states the following under the list of "DIRECTV Products Accused by Rembrandt": "The following list identifies accused set-top box devices made, used, offered for sale or sold in the United States, or [sic] imported into the United States, by DIRECTV . . . ." At oral argument on June 9, 2009, counsel for Rembrandt conceded that this document was written by counsel for Rembrandt. Mot. Summ. J. Hr'g Tr. 157, June 9, 2009. Third, DIRECTV's witness, Robert Rothaus (Senior Director of Set-top Box Engineering at DIRECTV) provides in his declaration a chart summarizing the accused set-top boxes, their manufacturer, and identifying the modem chip and middleware contained therein. There is no reason to believe that if Rembrandt intended to accuse the specific modems that there was any reason for them to repeatedly reference the accused set-top boxes and designate the STBs by product number instead of the actual modem chips. Were this to have been an isolated occurrence, the Court would be more open to the possibility that this was a simple drafting error. However, Rembrandt's repeated reference in court documents to the accused STBs and or the modems *contained in* the accused devices, leads this Court to conclude that the accused devices, at least as presented by

Rembrandt in this litigation are the STBs.  The Court next moves
on to a determination of whether the accused STBs infringe the
patents-in-suit.

    The Court holds that the accused STBs do not infringe the
patents-in-suit because the middleware precludes the devices from
performing in an infringing fashion and the devices not intended
to function in an infringing fashion.  On a motion for summary
judgment the Court takes facts in the light most favorable to the
non-moving party.  In this instance, Rembrandt has consistently
insisted that all modems that read on the V.34 standard
necessarily incorporate the technology covered by the patents-in-
suit.  While this is disputed by the parties, it will be accepted
as true by the Court for purposes of this motion. More
significantly, the parties agree that the STBs contain modems
that are designed to operate at the V.34 standard.  They also
agree that the accused STBs contain middleware, which functions
to among other things, preclude the STBs from functioning at the
V.34 standard, and instead facilitates operation at the lower
V.22 standard which the parties agree is not covered by the
patents-in-suit.  It is undisputed that, as Rembrandt states, the
"middleware does not destroy or disable any of the software or
firmware in the modem chips.  The middleware does not destroy or
erase the V.34 or V.92 capability of the modem chips.  DIRECTV's
software does not even change the software or firmware in the

20

modem chips." (Rembrandt Opp'n DIRECTV Mot. Summ. J. 16). All that remains is to determine whether the presence and function of the middleware precludes a finding of infringement as a matter of law. The Court finds that it does.

DIRECTV has accurately portrayed the fatal flaw in Rembrandt's logic in its Motion for Summary Judgment.

> Rembrandt postulates that DIRECTV can be liable for patent infringement because the specification sheets for the modem sheets for the modem chipsets that are contained in the Accused STBs suggest that these modems, if used in different devices or systems by different companies, with different controlling software (middleware or drivers) could operate at the high-speed modem protocols (V.8, V.34, V.90 or V.92) that Rembrandt claims infringe its patents. But Rembrandt ignores the critical fact that DIRECTV disables the allegedly infringing functionality, and thus as sold and used by consumers, the Accused STBs are incapable of performing the accused protocols.

(DIRECTV Mem. Supp. Mot. Summ. J. 17-18.) The Court adopts this position having examined the case law out of the Federal Circuit stating that the fact that an accused "device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) (citing *High Tech Med. Instrumentation v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995).

Three factually similar cases dictate a finding of non-infringement on summary judgment in this instance. The first

such case is *High Tech Medical Instrumentation v. New Image Industries*. In *High Tech*, the Federal Circuit was faced with making a determination of whether the accused dental device infringed the patent-in-suit where one of the crucial features of the patented technology was that the camera was rotably coupled to its housing, permitting the operator to rotate the camera during use. 49 F.3d at 1553. The accused AcuCam was not technically rotably coupled to its housing, however, if two set screws in the housing were loosened the camera was capable of rotation. *Id.* The district court found that this was sufficient to grant a preliminary injunction, despite the fact that there was "no reason for an operator to loosen the set screws during routine use." *Id.* The Federal Circuit disagreed, focusing on how the AcuCam was "designed, sold, and intended for use" as well as the impact of loosening the screws so that the camera could be considered rotably coupled (in this instance the impact was to make the image fall out of focus and the device unusable). *Id.* at 1555. The court concluded "a device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *Id.* Importantly, the court in *High Tech* also took the opportunity to distinguish *Intel Corp. v. United States International Trade Commission*, a case that Rembrandt relies on here. The Federal Circuit in

circumscribing the limited application of *Intel Corp.*, stated

that

> The [trial] court read *Intel* to mean that if a
> particular device can be altered without undue
> difficulty to operate in an infringing manner,
> the device, as sold, must be deemed to
> infringe.  *Intel* does not support so broad a
> holding.  All that was required by the
> limitation at issue in *Intel* was that the
> claimed invention, an integrated circuit memory
> device, was "*programmable*" to operate in a
> certain manner.  The accused device, although
> not specifically designed or sold to operate in
> that manner, could be programmed to do so; that
> is, it was "programmable" to operate in the
> designated mode.  The claim at issue in *Intel*
> therefore read on the accused device, as made
> and sold.

*Id.* at 1555-56 (emphasis added).  While Rembrandt would like for

this Court to find that it is only necessary to find that the

accused device is capable of operating the claimed functionality

in order to be infringing, in accordance with *Intel Corp.*, what

Rembrandt fails to recognize is the fundamental distinction

between that case and this one, that being the language of the

claim containing the all-important designation that the device be

"programmable" to function in a certain fashion.  That is not the

case here, and the Court would be remiss to read in such a

requirement.

     The two cases most on point and that ultimately dictate the

result on this issue are *Southwest Software, Inc. v. Harlequin

Inc.* and *Telemac Cellular Corp. v. Topp Telecom, Inc.*  In

*Southwest Software*, the Federal Circuit was presented with the opportunity to resolve a case involving the alleged infringement of patents involving a method of calibrating halftone output[6] images during desktop publishing.  226 F.3d 1280 (Fed. Cir. 2000).  One of the patents-in-suit (hereinafter the '257 patent) was "directed to a method and apparatus for calibrating halftone output images.  It 'programmably selects' a specific calibration set depending on imagesetter variables . . . ."  *Id.* at 1284. Subsequent to the commencement of the litigation, the defendant

> [T]ook action to "defeature" the automatic selection of calibration set feature of its accused product.  The "defeatured" product was ScriptWorks Revision 7.  With this "defeaturing, users of Harlequin's raster image processor could no longer activate the automatic calibration feature. . . .  The automatic selection source code used in ScriptWorks Revision 6 was not removed from ScriptWorks Revision 7.  Instead, using a common industry practice, the source code was modified so that the automatic selection feature could not be invoked during normal operation of the software.

*Id.* at 1287.  A jury found that ScriptWorks Revision 7 did not infringe the '257 patent.  On appeal, the argument was that the

---

[6]"[T]he process of 'halftoning' is used to create the variety of ink shades necessary to print images.  In the halftone process, shades of gray are approximated by applying variously sized ink dots of black ink within the area which is to be shaded."  *Southwest Software*, 226 F.3d at 1283-84.

jury verdict was against the great weight of the evidence,
because the computer code found to be infringing in ScriptWorks
Revision 6, remained in ScriptWorks Revision 7. *Id.* at 1291.  The
Federal Circuit declined to overturn the jury's verdict, stating
that "[t]here was substantial evidence to support the jury's
verdict.  Specifically, there was evidence indicating that
ScriptWorks Revision 7 included a manual step which avoided the
automatic selection feature of the patented invention even though
the code for automatic selection remained in place."  *Id.*

The Federal Circuit reached a similar conclusion in *Telemac*.
There the court was presented with allegations of infringement
in a case involving telephones.  247 F.3d 1316.  Telemac had
patented a debit cell phone wherein the user pre-pays for the
air-time when the phone is purchased.  *Telemac*, 247 F.3d at 1319.
The debiting was "accomplished using a program for carrying out
the functional steps of the billing algorithm."  *Id.* at 1320.
The telephone was programmed for local, long distance,
international or roaming calls.  *Id.*  Respondent also sold a
prepaid cell phone, however the accused TRACFONE was
"preprogrammed to recognize and block placement of international
calls . . . [and did] not calculate charges for international
calls using an international rate."  *Id.* at 1321.  The district
court granted summary judgment in favor of the defendant finding
no infringement because "the accused device [did] not store

25

international rates in its memory and [did] not deduct values from the credit amount based on such rates. . . . Accordingly the court determined that the accused device lacked the 'complex billing algorithm' limitation as construed." *Id.* at 1322-23.  On appeal, "Telemac contends that, even though Topp has chosen not to permit direct dialing of international calls, the capability of billing for international rates is nonetheless present in the phone's source code. . . . [B]ecause Topp's system is capable of being modified to place, and charge for, international calls, Topp's system infringes." *Id.* at 1330.  The Federal Circuit found this argument unavailing, citing to its prior decision in *High Tech* that a device's capability of infringing is insufficient by itself to support a finding of infringement.  *Id.*  In this particular instance the court upheld the district court's judgment because "due to a restriction built into the software program stored in the telephone's memory, a user of Topp's system is prevented from directly placing international calls." *Id.*

These cases dictate the result in this instance.  Rembrandt has insisted throughout this case that mere compliance with the V.34 standard is a sufficient basis for a finding of infringement.  Based on this argument and the previously discussed case law it necessarily follows that an STB that has been configured to preclude operation at the V.34 standard cannot

be found to infringe.  Similar to both *Southwest* and *Telecom* the presence of the middleware precludes functioning of the accused device in an infringing fashion.  It is uncontested that the patents-in-suit do not practice the V.22bis standard utilized by the STBs.  No evidence has been prevented to indicate that users may configure the STBs to function at the V.34 standard, or that it was intended to function in that fashion.  Furthermore, at oral argument on its motion, counsel for DIRECTV represented that even if a customer were able to configure the STB to operate at the V.34 standard that it would be of no use because the STBs are designed to work exclusively with the DIRECTV system, and only recognize V.22bis configured STBs.  (Mot. Summ. J. Hr'g Tr. 129, June 9, 2009).  Similarly to the accused device in *High Tech*, a DIRECTV STB configured to operate at the V.34 protocol would be useless and essentially stripped of all value to the consumer. The impact of altering the STBs minimizes the possibility that DIRECTV in any manner intended for the STBs to operate in an infringing fashion, a factor that according to *High Tech*, this Court may take into account.  For the aforementioned reasons, the Court therefore grants DIRECTV's Motion for Summary Judgment on the grounds that STBs are in fact the accused devices and the inclusion of middleware in the accused STBs precludes a finding of infringement.

27

*iv. AT&T-Rockwell License*

The Court grants Canon and DIRECTV's Motion for Summary Judgment on the basis of license and patent exhaustion with respect to the Conexant modems because the licenses were transferred to New Rockwell and subsequently Conexant and constitute licensed products under the Side Letter Agreement using a broad interpretation of the term as is appropriate in this instance. "[A] patent . . . owner may contract to confer a license on another party. . . . A licensee . . . has an affirmative defense to a claim of patent infringement." *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995). *See also Quanta Computer Inc. v. LG Elec., Inc.*, 128 S.Ct. 2109, 2122 (2008) (holding that the authorized sale of a patented object that is properly licensed exhausts the patent holder's rights and prevents claims of infringement against the purchaser). Here, Rembrandt has challenged Canon and DIRECTV's assertion that any Conexant modems accused of infringing in their products are licensed pursuant to the AT&T-Rockwell Licensing Agreement[7].

---

[7]The patents-in-suit were transferred by a series of transactions from AT&T to Zhone Technologies. On June 9, 2006, Rembrandt obtained the patents-in-suit via an assignment from Zhone Technologies.

The parties agree that "Rockwell International Corporation ('Rockwell') and the American Telephone and Telegraph Company ('AT&T') entered into a license agreement (the 'Rockwell-AT&T License'), effective October 1, 1988, that provided Rockwell with a license to 'AT&T's Patents' filed within the 'Limited Period' of the Rockwell-AT&T License." (Canon Mem. Supp. Mot. Summ. J. ¶ 4.) According to the terms of the License Agreement, the Limited Period "means the period commencing on the effective date of this agreement and having a duration of five (5) years." (*Id.* Ex. 6-A.) The applications for the '587 and '236 patents were filed by AT&T (or AT&T Paradyne) in 1992 and 1991 respectively. Pursuant to the terms of the AT&T-Rockwell Agreement, AT&T granted Rockwell the right to "make, have made, use, lease, sell and import LICENSED PRODUCTS. . . ." (*Id.*) The Agreement defines licensed products as "any product . . . or service listed for such grantee in Section 1.01." (*Id.*) According to Section 1.01(a) "AT&T grants to Rockwell . . . data communication station systems[8] . . . [and] . . . digital transmission systems[9]. . . ."[10]

---

[8]The Agreement defines Data Communication Station Systems as follows: "a STATION SYSTEM of a design primarily adapted for (i) sensing or accepting data to produce WAVES for transmission over a transmission facility, of (ii) receiving WAVES representing data from a transmission facility and converting the received WAVES into usable form for a data utilization device, or (iii) performing any combination of the functions (i) and (ii), and, if provided therewith, any such STATION SYSTEM includes the related error detecting, error correcting, monitoring, automatic answering, automatic dialing, answer-back and remote testing equipment involved in performing the functions thereof and

A proxy statement filed with the Securities and Exchange

Commission contains the following information dated October 29,

---

supervisory signaling and control equipment involved in controlling the performance of the foregoing functions; such STATION SYSTEM also includes, if provided therewith, a TELEPHONE STATION SYSTEM; but the term does not mean nor does it include any such source of data, any such data utilization device or any PRINTING TELEGRAPH STATION SYSTEM." (Canon Mot. Summ. J. Ex. 6-A.)

[9]Digital Transmission System means: (i) any aggregate of instrumentalities of a design primarily adapted for producing pulses representative of SIGNALS and preparing such pulses for transmission to a COMMUNICATION LINE or lines or RADIATED WAVE SYSTEM, or (ii) any aggregate of instrumentalities of a design primarily adapted for receiving from a COMMUNICATION LINE or lines or a RADIATED WAVE SYSTEM pulses prepared for transmission by (i) or (ii) and deriving SIGNALS from such pulses, or (iii) any aggregate of instrumentalities of a design primarily adapted for receiving from a COMMUNICATION LINE or lines pulses prepared for transmission by one or more (i) and/or by one or more aggregates of the types specified in (iii) and delivering said pulses, whether or not in regenerated or reorganized form, to a COMMUNICATION LINE or lines, or (iv) any combination of any of the aggregates specified in (i), (ii) and (iii) above; if provided therewith, such aggregates include auxiliary apparatus locally associated therewith and involved in performing the functions thereof, and any and all instrumentalities of a design for improving or controlling the transmission over the COMMUNICATION LINE or lines, the instrumentalities being adapted to be associated with the COMMUNICATION LINE or lines and interposed between the aggregates (i), (ii) and (iii), but the term does not mean nor do the aggregates include any aforesaid COMMUNICATION LINE, or any RADIATED WAVE SYSTEM, CENTRAL SWITCHING SYSTEM, DATA COMMUNICATION STATION SYSTEM or any instrumentalities electrically preceding the aggregate specified in (i) or electrically succeeding the aggregate specified in (ii). (Canon Mot. Summ. J. Ex. 6-A.)

[10]Canon suggests that the apparatus claims in the patents-in-suit are data communication station systems or digital transmission systems. While a reading of the patents as well as the definitions of these terms supports this conclusion, it is unnecessary for the Court to make a determination on this point at this juncture in order to resolve the issues before the Court.

1996 regarding Rockwell's (referred to in the following statement as "the Company") plan of merger:

> On July 31, 1996, the Company, The Boeing Company ("Boeing") and a subsidiary of Boeing entered into an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which Boeing will indirectly acquire the Company's Aerospace and Defense businesses. Among the transactions contemplated by the Merger Agreement is the contribution of the Company's Automotive businesses to a new company ("New Rockwell"), the shares of which will be distributed to the Company's shareholders immediately prior to the merger of the Company (then holding only the Company's Aerospace and Defense businesses) with the Boeing subsidiary (the "Merger"). Following the Merger, New Rockwell will be renamed "Rockwell International Corporation" and the Company will be renamed "Boeing North America, Inc."

(Opp. Canon Mot. Summ. J. Ex. A MacKenzie Decl.)   On December 6, 1996, an Agreement and Plan of Distribution was entered into by Rockwell International Corporation and New Rockwell International Corporation, along with several other corporations.   The Agreement acknowledges the recent merger with Boeing, and states that the purpose of the Agreement is to divest Rockwell International Corporation (hereinafter "Old Rockwell") of certain business and operations to be conducted by Newco (hereinafter "New Rockwell").   Article 2.1(a)(iii) of the December 6, 1996 Agreement indicates that "all Assets of the Company that are used primarily or that are held primarily for use in Semiconductor Systems Business . . . ." are to be distributed to New Rockwell.  The Agreement defines "assets" as: "any and all assets,

properties and rights, whether tangible or intangible, whether

real, personal or mixed, whether fixed, contingent or otherwise,

and wherever located, including, without limitation . . . (xi)

licenses, franchises, permits, authorizations and approvals . . .

." The Agreement defines the "Semiconductor Systems Business"

as:

> [T]he business heretofore and currently engaged
> in by the Company and its Subsidiaries and
> their respective predecessors of designing,
> building, selling, installing, modifying,
> repairing, servicing and supporting
> semiconductors for fax, voice and data modems
> for fax machines, personal computers and other
> uses, chipsets for cellular and cordless
> phones, wireless modem devices for laptop
> computers and modules for global positioning
> system receivers, and activities related
> thereto, and shall include any former or
> discontinued operations primarily related to
> the Semiconductor Systems Business as
> previously conducted.

(Canon Reply Mot. Summ. J. Ex. 1.) A reading of these documents

supports the conclusion presented by Canon that the patents at

issue belonged to New Rockwell, not Boeing or Old Rockwell as

suggested by Rembrandt.

Two years later on December 31, 1998, Rockwell would divest

the modem business as a stand-alone business (named Conexant)

pursuant to the Rockwell-Conexant Distribution. Pursuant to the

Cross-License of Intellectual Property detailed in Section 3.11

of the Rockwell-Conexant Distribution Agreement:

> (a) Effective immediately after the Time of
> Distribution, Rockwell, on behalf of itself and

the Rockwell Subsidiaries, hereby grants to the
Company      a      royalty-free,      world-wide,
irrevocable, non-exclusive license under all
intellectual property rights (including without
limitation, patents, patent applications, trade
secrets, copyrights or other similar industrial
property rights . . . which constitute Rockwell
Assets and which are owned by the Rockwell
Group or under which the Rockwell Group has a
right  to  license  without  the  payment  of
royalties to a third party immediately after
the Time of Distribution and which are used in
the conduct of the business of the Company
Group at the Time of Distribution to make, have
made, use, import, sell or otherwise dispose of
products,  or  to  practice  any  process  in
connection therewith, in the business of the
Company Group being conducted at the Time of
Distribution  or  any  related  extensions  or
expansions thereof; said non-exclusive license
being transferable only by sublicenses (to the
extent permitted in the case of any restricted
grant to Rockwell or a Rockwell Subsidiary, as
a licensee) to members of the Company Group and
in connection with the sale of all or any part
of the Semiconductor Business to which such
intellectual property rights relate.

(Canon Mem. Supp. Mot. Summ. J. Ex. 6-C.)  This same agreement

defined assets to include licenses.  The Court concludes from a

review of this series of agreements that the patents-in-suit were

covered by the initial agreement and through subsequent transfers

belongs to Conexant.  Rembrandt disputed the sufficiency of

Canon's evidence that the patents-in-suit went to New Rockwell,

and not Boeing, but the agreements produced in the course of this

litigation and quoted by the Court in this Opinion support the

conclusion that the licenses for the patents-in-suit were in fact

33

transferred to New Rockwell as part of the Semiconductor Systems Business, and subsequently sublicensed to Conexant.

The final question for the Court with respect to this issue is the resolution of the dispute between the parties as to the extent to which the 1995 Side Letter Agreement between the parties limited the nature of the products and services that would be covered by subsequent divestitures. Specifically, in the Side Letter Agreement between Rockwell and AT&T dated October 14, 1995, with respect to the October 1988 License Agreement, it was agreed that

> [T]he licenses and rights granted in the Agreement may be sublicensed to any future divested present business of Rockwell . . . . Such sublicenses may be granted and retained only while the future/divested business operates as a separately identifiable business and only to the extent applicable to products and services sold by the future divested business prior to its divestiture.

(Canon Mem. Supp. Mot. Summ. J. Ex. 6-B.)   Rembrandt advocates for a narrow interpretation of this provision, namely that "Canon must prove that the accused modems are the same as those sold before" either the date of the New Rockwell spin-off (December 6, 1996) or the Conexant divestiture (December 31, 1998).   Rembrandt maintains that Canon has not and cannot show that the Conexant modems incorporated into Canon's accused products were available in 1996 or 1998.   (Opp'n Canon Mot. Summ. J. 13.)   Canon rejects this narrow interpretation of the restrictions imposed by the

34

Side Letter Agreement, instead asserting that the terms "products and services" refer to modems in a broader sense.  As support for its position, Canon advocates that the term "product" be viewed in the context of the 1988 AT&T-Rockwell agreement where the license grant lists broad categories such as "Data Communication Station System" and "Digital Transmission Systems."  (Canon Reply 7-8.)  Canon counters Rembrandt's position that there is a dirth of evidence to support the conclusion that these categories include modems, by pointing out that Rembrandt has at no time argued that the license is in fact ambiguous, and its corporate designee has testified that Rembrandt is without evidence to suggest that a modem is not a data communication station system.

(Canon Reply 8 n.5; Canon Mem. Supp. Mot. Summ. J. 12.) Furthermore, Canon argues that modems were in fact the primary focus of the AT&T-Rockwell agreement as confirmed by the Side Letter Agreement, stating that

> In particular, the Side Letter Agreement
> required royalty payments only for Rockwell's
> "Telecom Sales" of "Reportable Products." The
> Side Letter Agreement defines "Telecom Sales"
> as "any sales of a business unit reported in
> Rockwell International Corporation's annual
> report (as of 1994) under 'Telecommunication'
> or its equivalent in future reports . . . "
> As shown in the Rockwell 1994 Annual Report,
> Rockwell International Corporations'
> telecommunications business unit consisted of
> the sale of modems, stating that Rockwell "is
> the world leader in fax and data modems."

(Canon Mem. Supp. Mot. Summ. J. 12-13.)

35

The Court has carefully considered these arguments and adopts Canon's interpretation of the terms of the License Agreement as well as the Side Letter Agreement.  There is no basis for conclusion that the terms "products and services" is entitled to the narrow interpretation proposed by Rembrandt. Such an interpretation would render the agreements virtually meaningless in the ever-changing and evolving arena of technology.  It would be nonsensical to think that savvy parties involved in an agreement of this magnitude would be so shortsighted as to limit the agreement presumably intended to stretch some time into the future to technology being manufactured at that time with no consideration of relevant future developments.  The Court therefore concludes that the terms "products and services" were intended to cover modems generally, not specifically the exact types of modems in production at the time of the sublicense and/or divestiture.[11] Therefore the Conexant modems contained in the Canon accused

_____

[11]The Court has also considered the evidence produced by Canon with respect to the parties' course of conduct.  Canon has produced uncontroverted evidence in support of its claim that "Rockwell, and then Conexant, paid AT&T/Lucent for this right to manufacture and sell modem chips – including V.34 - compliant modem chips– under the Rockwell-AT&T License.  Those payments totaled over 10 million dollars.  Moreover, during this time period, neither AT&AT nor Lucent sued Rockwell (or Conexant) for infringement of the patents-in-suit."  (Canon Mem. Supp. Mot. Summ. J. 13.)  While the Court does not feel that this evidence is necessary to its conclusion, it does present additional persuasive evidence that Canon's position accurately reflects that intent of the parties and the scope of the agreement.

products are licensed.  As such, Canon[12] is protected by the

doctrine of patent exhaustion as the purchaser of products made

by a licensee.  *Quanta Computer,* 128 S. Ct. at 2115.  In

conclusion, the Court grants Canon and DIRECTV's Motion for

Summary Judgment with respect to Conexant modems contained in the

accused devises finding that Rembrandt's patent rights are

exhausted because the Conexant modems are licensed pursuant to

the AT&T-Rockwell Licensing Agreement, the 1995 Side Letter

Agreement and the subsequent Conexant divestiture owing to the

fact that the license remained with New Rockwell as a part of the

Semiconductor Systems Business, was not a part of the Boeing

spin-off, was properly divested to Conexant, and the agreements

cover modem technology broadly.

DIRECTV has also argued for summary judgment on the basis of

a licensing agreement between PCTel and Paradyne that it believes

covers the source code that Rembrandt accuses of infringing its

patents that is included in the Si2493 modems.  The Court has

already granted summary judgment in DIRECTV's favor having found

---

[12]This section has specifically referred to Canon however, DIRECTV expressly adopted the arguments made by Canon with respect to Conexant modems and the AT&T-Rockwell License Agreement. Therefore, any conclusions pertaining to Canon in this regard also apply to DIRECTV.

that the '236 patent to be invalid and the STBs, not the modems contained within, to be the accused devices and not infringing as such.  Therefore, while the Court finds DIRECTV's licensing and exhaustion arguments with respect to the PCTel-Paradyne Agreement persuasive, it is unnecessary to address this argument substantively in light of the Court's prior findings.  The Court is compelled by DIRECTV's argument however that the patents-in-suit are covered by the original agreement and that Silicon Labs gained license for the technology via the August 3, 2000, development agreement between Silicon Labs and PCTel and that the involvement of Ittiam with this technology subsequent to the relationship between Silicon Labs and PCTel does not serve to terminate any rights and privileges enjoyed by Silicon Labs pursuant to its development agreement with PCTel.  As a downstream customer of Silicon Labs, DIRECTV enjoys the same protections as Silicon Labs.

### III. CONCLUSION

The Court grants Canon's Motion for Summary Judgment because the '236 patent is fatally flawed and therefore unenforceable, and the Conexant modems contained in the Canon accused devices are licensed.  The Court grants DIRECTV's Motion for Summary Judgment because the DIRECTV's set-top boxes are in fact the accused devices and the functioning of the middleware which limits the set-top boxes to operating at the V.22bis standard

instead of the V.34 standard precludes a finding of infringement as a matter of law. The Court also grants DIRECTV's Motion for Summary Judgment because alternatively, even if the set-top boxes were not the accused devices, both the Conexant and Silicon Labs modems contained in the set-top boxes are licensed.

For the foregoing reasons, it is hereby

ORDERED that Canon U.S.A., Inc., Canon Business Solutions, Inc. and Canon Information Technology Services, Inc.'s Motion for Summary Judgment is GRANTED. It is further

ORDERED that DIRECTV's Motion for Summary Judgment is GRANTED.

The Clerk is directed to forward a copy of this Order to counsel.

Entered this _21st_ day of August, 2009.

Alexandria, Virginia

08/ **21** /09

_____/s/_____

**Gerald Bruce Lee**
**United States District Judge**